Case number 21-1182, Christopher Garvey, Petitioner v. Administrative Review Board, United States Department of Labor. Mr. Garvey for the Petitioner, Mr. Fuentes for the Respondent, Mr. Connealy for the Intervener. Good morning, Mr. Garvey. You may proceed when you're ready. Good morning, Your Honors. May it please the Court. My name is Christopher Garvey. I'm here as a Petitioner. I'm very grateful for the opportunity to be here this morning and to answer your questions, albeit without the representation account. I'd like to start, if I may, by summarizing the issues that bring us before the Court. You have to speak up just a little bit. Sure. I'd like to start by summarizing the issues that bring us before the Court, and I'd like to reserve two minutes for rebuttal, if I may. In terms of the question whether the conduct at issue here was domestic or foreign, only, I think, in your reply brief, do you mention that the statute is primarily a securities law and that, therefore, because the protection is protection of the integrity of the U.S. Stock Exchange, the locus of the conduct is domestic? Did you make that argument anywhere before the reply brief? I think so, Your Honor. I think from the outset I've made clear that the way to interpret Section 806 is in the context of the greater regulatory scheme to which it contributes, which is Sarbanes-Oxley. I think the crux of where the Board went wrong, Your Honor, is precisely in interpreting this statute as a domestic labor law focused exclusively on the employee and the terms and conditions of employment. But I think in doing so, Your Honor, has failed to take account of the fact that Section 806 is an integral part of the Sarbanes-Oxley Act. And Sarbanes-Oxley, Your Honor, passed in 2002 in the wake of Enron, WorldCom, and global processing, is unmistakably a securities statute, an anti-fraud measure. And it contains numerous provisions, sure, but all of those provisions contribute to a single purpose, which is anti-fraud. And so I believe in focusing exclusively on the employment-related aspects of this, the Board has failed to give any weight whatsoever to issues to the protected activity and the nature of the protected activity or the conduct by the subject, the covered entity subject to the prohibition on retaliation. I would argue, Your Honors, that compensation to an employee is not here the focus of this statute. Compensation to an employee is similar in this case to the reward to an informant. It serves a purpose, which is to encourage people with first-hand knowledge of fraud to raise their hand and step forward. But to look at it exclusively as a domestic labor law, I think, entirely misses the point, Your Honor. You focused on the fact that you came to the United States, on the fact that you communicated with the legal department in the United States. I think the ALJ determination is a passive voice about who made the decisions that you allege were retaliation. Were they made by Morgan Stanley U.S., or were they made by the Hong Kong subsidiary? And what were the decisions that you allege constituted constructive discharge or retaliation? Sure. Those decisions were all made here in the United States. At least they were approved and initiated. My supervisors, I reported directly where I was located in Hong Kong. I've never challenged that, Your Honors. But I reported directly to people here in the United States, in New York. And the retaliation that I suffered, one was a reduction in pay. That reduction in pay was authorized and agreed here in New York by Morgan Stanley's chief legal officer. Was it initiated in Hong Kong? I guess it's a complicated structure. The Morgan Stanley's pay structure is such that all decisions around pay are controlled in the U.S. I believe it would have been a combination. It's in the record. The reduction in pay was agreed in order to, quote-unquote, deliver a message. Who are you quoting? This is... I'll find the reference, if you don't mind, when I come back on rebuttal. But it's in the joint appendix, Your Honors. It's an email that was exchanged on Christmas Eve, December 24, 2015, between Morgan Stanley's legal department's chief operating officer, James Murray, Chris O'Dell, who was one of my direct supervisors. And they referred to a conversation between, I guess, approval by Eric Grossman, who is Morgan Stanley's chief legal officer. And it comes at the behest, I think, of a gentleman by the name of Bill Porter, who is Morgan Stanley's chief international general counsel. The other retaliation I suffered, Your Honor, was a threat to future promotion prospects. That arose in the context of raising concerns about the manipulation of the investigation into the facts that I had raised. And that retaliation, the comment that I got in response to raising those concerns, was, well, you should be careful. Because the very people who you're accusing of being involved in the wrongdoing are the very same people you need approval from to obtain promotion. All right. I think I found the email that you're referring to, which I believe is on JA-64, Thursday, December 24, 2015. It says, Bill wants to reduce Garvey. This is from James Murray. Yes, correct. To O'Dell. Bill wants to reduce Garvey. Thinks Flatt is the wrong message. Correct. I'm not sure that that's send him a message, but thinks Flatt is the wrong message. Eric, not opposed. And Bill is where? Bill is the international general counsel. He's based in London. And then the final piece of retaliation that I think this court should take account of is the intimidation of counsel that occurred post-termination of employment here in Washington, D.C. I retained the services of the time Katz, Marshall and Banks. I think the difficulty there is that retaliation that you were no longer employed and to see that as retaliation by an employer in the course of employment is the basis of the ALJ's determination was that it's not. It's not employment retaliation. It's something else. Correct, Your Honor. And I believe that's exactly the mistake, because they look at this as purely an employment-related issue. I think the retaliation, the interference with an employee's ability to obtain representation and to file their claims under Section 806, I would argue, is distinct from the merits of their claim. To allow employers like Morgan Stanley, with hugely disproportionate resources, an extrajudicial path to determine which employees are entitled to file suit and to obtain representation of counsel in connection with doing so, I would argue is contrary to the spirit and intention, if not explicitly, of Section 806A2 itself. But it allows an extrajudicial path to determine who can sue them, which I would argue, Your Honor, is an obstruction of justice. And I don't believe that that would have been within the contemplation of Congress, either for this statute or, indeed, any other statute, whistleblower provision that the Department of Labor administers. One of the major difficulties is this notion that Congress would have contemplated a Department of Labor-administered whistleblower protection scheme to apply to employees whose place of employment, in your case, is in Hong Kong. The Department of Labor would, under your reading of the statute, have to investigate, theoretically, whether people in Hong Kong were taking retaliatory action against you. They'd have to look at the, you know, claims of, in a classic case, claims whether adverse action was taken based on the quality of work or not. You know, it's a very fact-intensive and extensive kind of inquiry that can happen in retaliation cases. And the Department of Labor, no indication that Congress thought the Department of Labor was going to be conducting overseas investigations. That may be the case, Your Honor, but I don't believe it's any different, frankly, to cases here. I think the language of the statute, in my opinion, clearly and unmistakably extends the coverage of Section 806 to foreign companies with a class of securities registered under Section 12 and or affiliates whose financial information is included in the consolidated financial statements of the issuer. That's crystal clear from the language, and many of those companies, Your Honor, don't have domestic employees. To accept the board's interpretation of that language would involve significant redundancy. I think because the language would apply to a significant number of companies who do register securities under Section 12 but who don't have domestic employees. And I believe I'm confronted with two competing versions, two competing interpretations of the same statute, one of which involves significant redundancy and one of which doesn't. I believe this court should adopt that interpretation, which avoids significant redundancy, particularly where, as in this case, the interpretation that avoids significant redundancy is consonant with the overall goals of the statute, which, again, I argue are to prevent and detect and prosecute fraud to protect U.S. investors here in the United States. I see that I'm over my time, Your Honors. Thank you. Thank you. Steve, are you ready? Thank you, Your Honors. May it please the Court, Reynaldo Fuentes for the U.S. Department of Labor for Respondent. This court should affirm the Administrator Review Board's dismissal of Mr. Garvey's complaint for a straightforward reason. Section 806 of the Sarbanes-Axley Act does not apply to employees whose primary or principal place of employment is on foreign soil. The Supreme Court has repeatedly held that absent a clear, affirmative statement from Congress, courts are to presume that federal statutes do not apply extraterritorially. Here, Section 806 does not contain such a clear, affirmative statement. Why isn't the definition of listing companies that includes foreign companies that list on U.S. exchanges enough? Yes, Your Honor, we do understand that the coverage extends to some foreign employees under both Section 12 and Section 15D, as Mr. Garvey has alleged. What we're concerned with is the geographic reach of those statutes, not necessarily the companies that are covered under that statute. We also contemplate a scenario where Congress considered the foreign companies to ensure that they are covered under the Anti-Retaliation Statute if they operate within the domestic bounds of the United States. And so that's why it goes to that first step, the Morrison First Step analysis, which is, is there a clear, unmistakable statement from Congress that the statute is meant to apply extraterritorially? And here, there is not, because the text and the structure and the legislative history of Section 806 indicate that Congress was not concerned, necessarily, with the international conduct and the retaliation, not necessarily the retaliation, but the international conduct as it relates to Section 806. The counter-argument, clearly, is that what Congress was concerned about was the integrity of U.S. stock exchanges. And it would seem to blow a big hole in the safety net that Sarbanes-Oxley erects to say, well, you know, if you're employing people overseas, and under your reading, you know, they're sitting overseas, but they're actually reporting directly to U.S. managers. They're making decisions that affect the value and the integrity of stocks that are traded on U.S. exchanges, and although we want to encourage employees throughout publicly traded companies to speak up, and they see something unlawful, we don't want employees who are located overseas to speak up. It seems to me that that creates incentives for companies to move their employees overseas and do whatever hanky-panky the Sarbanes-Oxley provision was trying to put a stop to. The government's position would not be that this creates a hole that eviscerates protections that Sarbanes-Oxley was enacted to remedy. We do recognize, and we agree with Mr. Garvey, that the meta-purpose, the broader purpose of Sarbanes-Oxley is to perform a noble goal, which is to ensure that we have a regulated securities market that is safe for all investors. And isn't your position that 806 obligations apply? It's just the individual employee's remedy doesn't apply? If the employees are based within the United States, or the domestic territory of the United States, then yes, those protections necessarily would apply because Congress wrote the statute to apply to the retaliation of employees, but did not provide extra-territorial enforcement. You just said, did not provide extra-territorial enforcement, and my question was, is it only enforcement that's not available, but is the obligation on those issuers that they can't retaliate even overseas? The Department of Labor won't go after them, but they are legally obligated by U.S. law not to retaliate against those whistleblowers, or is that not your position? Correct, the retaliation provisions, yes, do not extend to those companies necessarily under 806 to the employees that are engaged, and where their primary or principal place of employment is abroad. But that doesn't stop international enforcement entirely, and that goes actually to a question that helps illuminate Section 806 entirely. When Section 806 was amended after the Morrison decision, Congress gave extra-territorial enforcement jurisdiction to the SEC to presume to perform the types of international investigations that, as Your Honor Judge Bowdoin mentioned, the DOL is not in a position necessarily to investigate. At the same time, they amended Section 806 and did not give it explicit extra-territorial reach, and so we can surmise from that exchange and from the way that the legislation was drafted initially that there is not extra-territorial reach. And so that is one of the facts that confirms Congress's intent. Can you be more concrete when you say that there is international enforcement? What are you citing, chapter and verse? The SEC – and forgive me, I don't have the statutory citation – the SEC has the provisions under the Job Training Act to perform international enforcement of some securities laws violations, and here they may not be able to reach the type of retaliation claims that perhaps the whistleblower might be able to identify, but absent a clear expression from Congress that Section 806 would apply to employees' primary or principal place of employment is abroad, we would be violating that presumption, and we want a clear statement from Congress. In terms of the locus of whether it's domestic retaliation or foreign retaliation, the place where the person is employed seems to me not a very persuasive test. So under your test, if Morgan Stanley New York employs people and says, you know, having learned from remote work during the pandemic, you can be anywhere in the world you want to be, but you report to us. If the person is in Hong Kong, it's your position where they sit in a chair at a desk in Hong Kong, not covered. My first response to that answer was that the ARB has not defined precisely what primary or principal place of employment would necessarily mean in every circumstance, and they recognize there could be factual scenarios in the future that present more complicated questions. Like what? For example, an employee who may be remote or an employee who is on detail. Somebody whose primary or principal place of employment could be in the United States, but they are only abroad. He said that he reported to people in New York. Yes, and to the question of reporting, absolutely. We have ARB decisions in who the First Circuit in Carnero, the Supreme Court in Kyobel recognizing that there can be connections, including corporate decision making that could slow down and affect necessarily how the employment relationship is being governed. But they're not necessarily dispositive of the question around extraterritorial reach. Corporate decisions, that's a much more general, you know, making policy decisions that, you know, tangentially affect the employee. But I take Mr. Garvey and be saying I was working for the New York folks directly. Well, in this circumstance, Mr. Garvey was employed for the Asian subsidiary of Morgan Stanley, worked primarily in Hong Kong, had an employment agreement that was governed by the laws of Hong Kong. In fact, we want to avoid these types of foreign conflicts in the future. That's what animates the presumptions concern. But here, Mr. Garvey's connections may be very similar to Carnero, the First Circuit decision that was decided before the Morrison decision, which actually indicated that there was corporate decision making decision makers sitting in the United States who might have made a decision to retaliate or initiated that system. And there there was no extraterritorial reach for Section 806. I see that I'm out of my time, but if your honors have any further questions, I'm happy to answer. What do you what's your best response to the. Description in Mr. Garvey's brief, there's Levin and Walters saying Section 806 does not protect employees for the sake of improving labor standards or conditions. Whistleblowers act on a voluntary basis. They remain silent. Their jobs are not in jeopardy. They can get along if they go along. The primary goal of Section 806 is not labor protection. It's to encourage employees to voluntarily take action that Congress thought was in the public interest. It's about protecting the stock market from fraud. It's just that the government doesn't disagree that a whistleblower's complaint and engagement in protected activity might somehow reduce the results of the survey as a whole. It's not incidental. It might somehow produce. We're going to keep your job safe. And because you're a happy employee, you might, you know, tell someone if something goes wrong. No, no. The whole point of it is tell us. And because the market depends on it, we live through and not absolutely. And the legislative history indicates that Congress was concerned with domestic whistleblowing that Congress. There was evidence in the legislative record that there was a patchwork of whistleblower protections for domestic employees that Congress sought remedy for Section 806 by creating a floor. Some states had stricter laws. Some had none whistleblower protections. And so that's what animated congressional concern. And Congress had two bites at the apple, both when they enacted Sarbanes-Oxley and when they amended Section 806 to provide express extraterritorial reach. And they failed to do so. And I think that is a telling example of why this this would not reach. Alex, questions. Rogers. All right. Here for Mr. Kelly. Thank you. Good morning, Mr. Kelly, may proceed and please support the ARV in the first and second circuits are right. The whole section 806 does not extend to employment outside the United States. And I think here it's really critical to recognize it. And it does sit as a statute that has implications for employment in foreign countries because the Supreme Court has said in a series of cases dating back police brothers in 1949 and Aramco again in one. But this is a setting where the possibility for international friction is very high. And when you add the private right of action that's in Section 806 B, that only increases. And so I think the ARV and the courts have latched on to that quality of Section 806 in characterizing its focus as being about the terms and conditions of employment and adverse personnel action. So I just want to point out a couple of examples of Congress has done exactly that. And most notably, I think, Title seven, after Aramco held a meeting with Congress, which was held in January of last year. It held that no foreign employment was covered under Title seven. Congress came back and didn't say, yes, it all is or didn't say that all U.S. employee U.S. employer subsidiaries are covered. It said that U.S. citizens with respect to employment in foreign country are covered. And I think that that's an important limitation and the kind of limitation that Congress can draw when it's cognizant of the possibility of international discord. The same conduct did it if it reached the level of criminal intent reachable under Sarbanes-Oxley. In other words, retaliating against someone who's trying to come forward to expose fraud. My my impression was that that that there is extraterritorial criminal jurisdiction. For whistleblowing in particular, your honor, I'm not sure about that. There are, as pointed out, amendments in 2010 to Dodd-Frank to increase the SDC's power to go after fraud overseas. I'm not sure. Usually whistleblower actions like this are at the civil level and there are others as well. There's the there's one actually in Dodd-Frank. The Second Circuit has construed it as not having extraterritorial reach either. But I'm not aware of a criminal version of this particular statute. But I do think it's important not to lose sight of that private right of action. And I think when you're looking at the focus under step two of Morrison, the Supreme Court's discussion in RJR Nabisco, I think, is very instructive in going by subdivision, subsection by subsection through RICO to look at the focus. And then at Western Gecko as well. They look not only at the damages provision, but also the infringement provision to find out the focus at issue in that case. The whether this even raises an overseas application at all. Why? Sounds from the allegations like the Department of Labor could just investigate Morgan Stanley in New York. I don't think that's true, Your Honor. And I think that underlying facts here about the protected activity, the alleged protected activity illustrate the difficulties with litigating this kind of case, because a lot if it went to the merits, say in front of the agency, a lot will turn on the nature of the report and whether Morgan Stanley took it seriously or whether it decided to sweep it under the rug and retaliate against Mr. Garvey. We obviously don't think that that's what the facts would show. But the underlying events here concern investments in a power plant in India and investments in China. These are these are very complicated international transactions that would implicate the merits of the claim to see whether there's a causal connection between the protected activity and the alleged retaliation. And so I think the issues get very complicated very quickly. And that explains why the possibility for international friction is not just at the level of the employment relationship, but also investigating the underlying protected activity. I'm not sure I entirely follow that in this case. I'm not following that at all, because it's complicated. Suppose he was sitting in the U.S. and there's no doubt it's not extraterritorial. He's here. He's making the same kinds of claims. You're going to come back and say, well, some of them are complicated, involve international companies. No, Your Honor, I'm sorry. I didn't mean to suggest that. Obviously, that's an easier case with respect to the regulation of the employment relationship, because that he wouldn't have a contract governed by Hong Kong law as he does here. I'm just saying that I don't want to I don't want to give the impression that that the international character of the underlying events here are only superficial. They actually he had a portfolio involving Asian Pacific legal issues. And he said a ninety six that he didn't. Morgan Stanley did not rely on him for the delivery of any U.S. law advice. So I just wanted to give the court to have the impression that this case is really about U.S. law. Hundred percent. But what I'm taking from your answer is that if it happened that Mr. Garvey were doing the same work. And actually sitting in the offices in New York. That somehow the Department of Labor couldn't feasibly do consistent with international comedy, do an investigation. But I gather that it would be required to. I think that's because the focus of Section 806 is on the employment action itself. The Department of Labor would not be investigating the underlying alleged fraud. That would be under the SEC's purview, if anything. So so that I actually think that this helps support our interpretation of the focus of Section 8. Because the Department of Labor standard just looks to where he sits. It didn't inquire whether the retaliation alleged here was actually emanating from New York taking place in New York. Some of this record evidence suggests. And Mr. Garvey claims is the case. Well, I think in any of these cases where the employee sits will be part of where the retaliation occurs because you cannot have. But that's what they limit their inquiry to that. And that seems wrong. Even under your analysis, it just seems clunky and narrow and not really indicative of. Of the question that that extraterritoriality or not requires us to ask. I don't think so, Your Honor. And I think I mean, remember that Mr. Garvey is alleging primarily a constructive discharge claim. So he resigned from Hong Kong. And so the alleged retaliation, if any, occurred in Hong Kong, not in the United States. And many of these cases, the who case, the or a case, even some of the narrow case involved levels of oversight in the United States. Even though the employee was located abroad in all of those cases, brought the same line that we're advocating for here. What's the law in your mind? What's the most telling consideration to show that this is extraterritorial? Take the location of the work site, which is where the alleged adverse effect on terms and conditions of employment was felt. And it is the most important consideration. Thank you. Thank you. Did Mr. Garvey have any remaining time? All right, Mr. Garvey, we will give you two minutes for rebuttal. Thank you, Your Honors. I'd just like to quickly address a couple of points that my friends have raised. Possibility of foreign friction, Your Honors, I think is a little bit of a red herring here. I'm not seeking reinstatement. And I believe it has ample flexibility in what relief to award. And so I don't believe that would be an impediment to hearing this case and accepting jurisdiction. I'd like to point out, too, that the Carnero decision was ultimately rendered on the basis that there was, in fact, no. There was no protected activity under the statute because the concerns of Mr. Carnero raised, in fact, about violations of laws of Brazil and potentially Argentina and not U.S. laws. I've raised here concerns directly about U.S. law and domestic fraud, which is precisely the interest, I would argue, that this statute serves to protect. And finally, Your Honor, I would just address the point that the statute itself, 2010, when Congress amended the Sarbanes-Oxley Act in 2010, I believe that amendment, it introduced language which said that it clarified what had become, what was unclear as a result of Carnero. Did our subsidiaries include it or not? The formulation that Congress used very specifically for the second time running extends to foreign companies. The formulation, Your Honor, is that it includes a subsidiary or affiliate whose financial information is included in the consolidated financial statements of the issuer. That formulation is a technical formulation. It does not respect boundaries, Your Honor. It does not respect national boundaries. But that doesn't reach all employees who are working overseas. It reaches all employees who are subsidiaries that fit that definition, that's all. Well, Your Honor, the Supreme Court's case of Lawson v. FMR, which also interpreted the language of Section 806, concluded that when the statute refers to a covered entity, it refers to that covered entity. It imposes an obligation on that covered entity not to retaliate against its own employees. I mean, that's just that's a very strange way for Congress to amend the statute to get the result that you're now urging. Because all you have to do is say extraterritoriality is not a limitation here. And discussion to do it by saying these companies who are registered, certain subsidiaries, employees in that situation will have protection and that's it. That's a real stretch. I don't know how to write that. I hear what you're saying, Your Honor, but to that point, I think, again, it would only be emphasizing, reinforcing what was already the case, the precise language of Section 806, the coverage of companies covered with a class, the coverage of those companies. Do you think the statute faced it facially? I think facially, Your Honor. That isn't the way I read your argument initially. You seem to accept the problem of extraterritoriality. And then you were working your way through in the brief to see if you could find some openings here or there. But the assumption that you have the extraterritorial bar and that you were in a bad situation there, but you were trying to find other ways out, you had connections to New York, et cetera. I'm really surprised to hear this argument now. That is not the argument I got from your brief. Your Honor, I would disagree. I believe the language, frankly, is unmistakably extends extraterritorial. I agree the statute unhelpfully doesn't use the language or the words foreign or extraterritorial. But I don't believe it's necessary where the implication of... Is there a presumption I'm supposed to follow as a judge? Well, there's a presumption. The presumption against extraterritoriality, sure, Your Honor, but it is just a presumption. And that presumption is the... I think what we can all agree on is it doesn't operate as a limit on Congress's power to legislate. And where the text is here, as I argue, as I would suggest, is that the coverage of companies with a class of securities registered under Section 12 is abundantly clear. Those are creations of Congress itself. I mean, was it the 210 Amendment? The 210 Amendment, I think, just hurt you badly. Because if you're starting out with what you say, there's no extraterritorial bar. There was no reason for that later amendment. And then when you get the later amendment, it's limited to certain situations and employees in those limited situations. But I don't know how that helps you. I think that as soon as I saw that, I said, that really is a damning consideration here, because Congress could have easily said, if there's any confusion about extraterritoriality, we're getting it out. Any kind of ownership relationship at all, you're covered. That's not what they said. Right? I think that Congress was not as clear as perhaps it could have been, Your Honor. But I would argue that, again, the case law subsequent to Carnero immediately before the passage of the Dodd-Frank Act and Section 929A, you have the case that Judge Pillard referred to, which is Walters v. Deutsche Bank, which is in 2009. It's an ALJ decision. It's not a board decision. But I think it signified pretty clearly at that time that the Department of Labor itself was leaning in the direction of the arguments that I'm presenting here this morning. Thank you. Thank you. Judge Rogers, any questions? Thank you very much.
judges: Pillard, Edwards, Rogers